## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JOANNE M. ICKES,

                Plaintiff,

                      v.

Case No. 13-14260
HON. TERRENCE G. BERG

NEXCARE HEALTH SYSTEMS, L.L.C., and
SOUTH LYON SENIOR CARE & REHAB
CENTER, L.L.C.,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 46)

Plaintiff JoAnne Ickes was fired from her job as a physical therapist after allegedly reporting illegal practices at her workplace. On October 7, 2013, she filed a lawsuit against Defendant NexCare Health Systems L.L.C. ("NexCare"). (Dkt. 1). She subsequently amended her complaint to add Defendant South Lyon Senior Care and Rehab Center ("South Lyon") on April 21, 2015. (Dkt. 36). On June 1, 2015, Defendants filed a motion for summary judgment. (Dkt. 46). Following full briefing, the Court held oral argument on December 15, 2015. For the reasons explained below, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.   FACTUAL AND PROCEDURAL HISTORY

### A.   Plaintiff Began Working for Integrity, a Company Related to Defendants NexCare and South Lyon

Plaintiff has been a licensed physical therapist for nearly 30 years.  (Dkt. 1, p. 4).  In October 2006, non-party Integrity Rehab Services ("Integrity") hired Plaintiff and assigned her to provide physical therapy services at South Lyon, a nursing home in South Lyon, Michigan.  (Dkt. 46, p. 2).  Integrity had contracted to provide rehabilitation services to South Lyon.  (Contract, Dkt. 46, Ex. D).  Defendant NexCare provided management services to South Lyon.  (Anderson Dep., Dkt. 46, Ex. A, 31:20-32:25).  Among many management services, NexCare provided South Lyon with compliance and oversight services to ensure that its practices were consistent with applicable federal laws and regulations.  (*Id.* at 33:1-34:9).

The three companies had more in common than just providing services at the same nursing home.  Integrity and NexCare, though separately incorporated, operated out of the same building and shared the same Post Office Box.  (Dkt. 46, p. 1; Milgrom Dep., Dkt. 46, Ex. C, 83:5-7).  Although Plaintiff received her paycheck from Integrity, NexCare managed her 401(k) retirement plan and administered her health care benefits.  (Plaintiff Dep., Dkt. 46, Ex. G, 69:20-70:1; Milgrom Dep., at 36:9-14).  The record also shows that Integrity South Lyon and NexCare shared at least some common owners.  Integrity was owned by Rich Sherrer, Tom Rau, and Jim Branscum.  (Milgrom Dep., at 14:14-15).  At some point, South Lyon had the

same owners. (Anderson Dep., at 49:22-50:1). NexCare was owned by Tom Rau and Jim Branscum. (*Id.* at 29:2-11).

In addition to ownership, the personnel at the companies had interrelated reporting relationships. For example, South Lyon's former administrator Michelle "Shelly" Berryman was hired by and reported directly to Susan Oginsky, a high-level executive at NexCare. (Berryman Dep., Dkt. 46, Ex. E, 26:23-27:22; Anderson Dep., at 32:4-21).

All employees who worked at South Lyon, regardless of whether their employer was South Lyon, Integrity, or NexCare, were subject to NexCare's corporate compliance program. (Milgrom Dep., at 75:25-76:3). Under this program, Integrity employees could report compliance violations directly to South Lyon's administrator. (Milgrom Dep., at 80:12-25). (Berryman Dep., at 38:23-25; Milgrom Dep., at 75:25-76:3). Integrity employees were also required to attend trainings conducted by South Lyon. (Milgrom Dep., at 85:1-9). Despite their close operational relationships, there were no business association agreements between Integrity, NexCare, or South Lyon. (Anderson Dep., at 21:1-22:20).

## B. In 2008, Plaintiff First Became Aware of Potential Compliance Problems with South Lyon's Dual-Certified Beds

In 2008, Plaintiff first learned that South Lyon employees were telling patients that the facility did not have long-term beds available. At that time, South Lyon was being managed by a different administrator. (Plaintiff Dep., at 124:13-125:14). Generally "[a]ll nursing facilities want short-term rehab residents."

(Milgrom Dep., at 34:19-21).  Medicare Part A covers short-term patients; it pays for up to 100 days of therapy services, after these 100 days, patients must pay for services under Medicaid or private pay.  (Plaintiff's Dep., at 115:15-20).  Nursing homes that have "dual-certified" beds must make those beds available to patients regardless of whether their payments come from Medicare Part A, Medicaid, or private sources.  (*Id.* at 123:25-124:4).  This is true even though "as a general statement, Medicaid paid less than Medicare [Part A]."  (Milgrom Dep., at 57:13-14).

Because all beds at South Lyon were "dual-certified," once a patient was admitted to a bed, that patient could not be told that South Lyon did not have space to continue to accommodate the patient for a long-term stay.  (Anderson Dep., at 70:16-20).

Alarmed that South Lyon employees were telling patients that there were no long-term beds available, Plaintiff e-mailed elder law attorney Alison Hirschel.  (Plaintiff Dep., at 124:13-125:4).  On October 24, 2008, Hirschel replied in an e-mail stating "[a]s you suspect, if all beds are dually certified, it is illegal under federal law to discharge [patients] when their source of payment changes to Medicaid."  (Plaintiff's Notes, Dkt. 46, Ex. N, Pg. ID 666-67).  Plaintiff did not report this incident to her employer because she heard the practice stopped when Harry Slater, a new administrator, arrived at South Lyon.  (Plaintiff's Dep., at 125:11-14).

4

**C. Berryman Arrived with the Goal of Increasing Short-Term Patients at South Lyon**

In June 2012, Berryman replaced Slater as the administrator of South Lyon. (*Id.* at 125:12-16). Berryman served as the administrator of South Lyon from June 2012 until June 2014. (Berryman Dep., at 5:13-15). As the administrator, Berryman was in charge of the daily operations of the nursing home and "all of the staff members that worked for [South Lyon] reported to [her]." (*Id.* at 7:15-17). Berryman arrived at South Lyon with a vision of increasing the facility's percentage of short-term patients. (*Id.* at 11:23-12:6). Berryman wanted to have 50 percent of all patients be short-term patients, because this was "financially beneficial." (*Id.* at 45:16-46:7). She sought to achieve this goal by accepting only those patients who were expected to be short-term rehab patients. (*Id.* at 12:8-10).

**D. Plaintiff Learned that Patients were Being Told that No Long-Term Beds were Available**

In July 2012, Plaintiff's co-worker, therapist Valerie Whalen, had a care conference with a patient. (Plaintiff's Notes, at Pg. ID 666). At care conferences, the patient, therapist, and social worker meet and the therapist would give his or her recommendation as to whether the patient should remain in the facility or not. (Plaintiff's Dep., at 127:8-14). At Whalen's conference, South Lyon social worker Kathleen Camps allegedly told Whalen's patient that there were no long-term beds available because the patient's insurance had changed from Medicare Part A to Medicaid or private pay. (Plaintiff's Notes, at Pg. ID 666; Plaintiff's Dep., at 103:9-104:4). Whalen later raised this with Barbara Sturtevant, Integrity's Rehab

5

Coordinator, who managed the therapists, and Sturtevant told Whalen that if she did not like this practice "she should look for another job." (Plaintiff's Notes, at Pg. ID 666). While Plaintiff made notes of this incident based on her recollection of what she had heard from Whalen and Sturtevant, Whalen's own testimony is consistent with Plaintiff's notes. (Whalen Dep., Dkt. 46, Ex. W, 7:18-8:24).

Plaintiff claims that Sturtevant approached her after Sturtevant spoke with Whalen and that Sturtevant told her that she felt "terrible" about threatening Whalen's job. (*Id.*) Plaintiff then told Sturtevant that she agreed with Whalen and that it was not right to tell patients that "there are no long term care beds available when the beds are dually certified." (*Id.*)

During discussions with her co-workers, Plaintiff states that she also learned about three other patients who had allegedly been discharged because they needed long-term beds. (Plaintiff's Dep., at 107:12-18). While no specific time frames are provided, Plaintiff indicates that the first patient, R-1,[1] was transferred to a different nursing home despite his family's desire that he remain at South Lyon. (*Id.* at 110:10-20). Two others, H-2 and M-1, whom Plaintiff believed needed long-term care, were also transferred to different nursing homes. (*Id.* at 111:3-25). Plaintiff reports that the other therapists were "very upset" that the patients were being transferred. (*Id.* at 111:1-112:3).

---

[1] Because of patient privacy laws, the parties have only provided initials for the patients' names.

**E. Plaintiff Raised Compliance Concerns on Multiple Occasions within Integrity**

Plaintiff's continued concerns about whether South Lyon was telling patients that there were no long-term beds led her to contact Patricia Milgrom, the President and Chief Operating Officer of Integrity. (Milgrom Dep., at 33:3). On August 3, 2012, Plaintiff met with Milgrom and told her that South Lyon was discharging patients for improper reasons. (Plaintiff's Dep., at 125:23-25). Specifically, she told Milgrom that Berryman, along with South Lyon admissions coordinator Loraine Hart and social worker Camps were telling them that there were no long-term beds available. (Plaintiff's Notes, at Pg. ID 666). She also informed Milgrom that she had discussed the issue with attorney Hirschel. (*Id.*) Milgrom told Plaintiff that she would look into it and get back to Plaintiff (Plaintiff's Dep., at 128:13-15), but also warned Plaintiff that her actions raised patient privacy concerns (*id.* at 138:14-21).

When Plaintiff raised this concern, Milgrom states that she did not know whether it was legal to tell patients that the facility did not have long-term beds available. (Milgrom Dep., at 105:8-11). In fact, during her tenure at Integrity, she states that she never found out whether this was a permissible practice or not. (*Id.* at 134:10-16). Milgrom was concerned that Plaintiff's interest in the matter was creating a tense environment in the rehab department (*id.* at 108:16-25) and felt that therapists only had a narrow role to play in patient discharge decisions (*id.* at 149:1-11).

7

On August 21, 2012, Plaintiff e-mailed Milgrom again informing Milgrom that she had contacted the Oakland County Ombudsman and confirmed with attorney Hirschel that "if a person is admitted under [Medicare] Part A and then needs to stay they are entitled to the bed they are in or another one in the home." (E-mails, Dkt. 46, Ex. O, Pg. ID 676).  She also requested to meet with Berryman in order to understand Berryman's interpretation of patient discharge rules.  (*Id.*) Milgrom responded that she wanted to meet with Plaintiff before Plaintiff met with Berryman.  (*Id.* at Pg. ID 677).

This same day, Plaintiff told therapist manager Sturtevant, Plaintiff's supervisor at Integrity, that she would be meeting with Milgrom again.  (Plaintiff's Dep., at 130:5-10).  Plaintiff claims that Sturtevant became "very upset" and asked Plaintiff whether she was trying to close down South Lyon or change all the nursing homes in Michigan.  (*Id.* at 130:5-21).

On August 22, 2012, Plaintiff met with Milgrom.  Milgrom told Plaintiff that she needed to be careful about telling patients that they could remain at the facility because that was a job for social workers, not therapists.  (*Id.* at 139:15-18). Plaintiff believed that eligibility was not a problem, since if a patient qualified for a transfer to a different nursing home, then the patient also qualified to remain at South Lyon.  (*Id.* at 143:8-16).  Plaintiff was not satisfied because Milgrom did not provide her with documentation on the issue that she was raising—the propriety of telling patients that long-term beds were not available.  (Plaintiff's Notes, at Pg. ID 669).  At the meeting, Plaintiff again requested to meet with Berryman.  (*Id.*)

8

On August 24, 2012, Plaintiff sent Milgrom an e-mail with a letter attached. (E-mails, Dkt. 45, Ex O, Pg. ID 699).  She wrote, in part:

> I heard and understood what you said about Medicaid eligibility and level of care.  Understanding that does not take away from the fact that it is illegal to tell a patient who is skilled[2] under Medicare [Part] A and is in a dually certified bed that there are no 'long term beds available.'  Yes, if they do not fit the Medicaid criteria then they cannot stay under Medicaid.  However, in the examples we discussed, these people were not told that.  They were told there were no [long-term care] beds.  In fact, help was even given to the family of at least one of these patients to find another facility as I was assured by the social worker.  So, ineligibility is not the case

(*Id.*)  Plaintiff continued that it was not an option for her to mislead patients as to whether long-term beds were available.  (*Id.*)

On the same day, Plaintiff spoke with Amy Mills, the Oakland County Ombudswoman.  Mills told Plaintiff that "when a person is in a dually certified bed and their [Medicare Part A] days are completed they have the right to stay in the bed if they need long term care (LTC), fit the guidelines for LTC, and agree to pay privately or by Medicaid if they have no funds."  (Plaintiff's Notes, at Pg. ID 669).

### F. After a Series of Additional Meetings, Plaintiff was Assured that Patients would not be Told that Long-Term Beds were not Available

On August 27, 2012, Plaintiff met with Berryman.  Plaintiff began by telling Berryman that South Lyon could not tell patients that long-term beds were not available.  (Berryman's Notes, Dkt. 46, Ex. R).  Plaintiff told Berryman that Camps

---

[2] From the context of the record as a whole, the Court takes this reference to refer to a patient who is receiving treatment from a skilled physical therapist.

and Hart were telling patients that long-term beds were not available.  (Berryman Dep., at 13:22-15:5).

Berryman explained to Plaintiff that patients were being told upon admission that they were admitted to South Lyon "for short term rehab only."  (Plaintiff Dep., at 145:7-13).  Plaintiff understood that Berryman was telling her that as a policy, South Lyon was going to force patients to leave once their short-term rehab concluded.  (*Id.* at 146:16-25).  Berryman told Plaintiff that she intended to reorganize South Lyon to create two patient halls exclusively for short-term rehab patients, and two patient halls exclusively for long-term patients.  (*Id.* at 232:1-25). Berryman allegedly added that if patients in the short-term halls needed long-term care, that she would tell them that there were no long-term beds available.  (*Id.*)

At this meeting, Berryman confessed that she did not know whether it was legal to tell patients that long-term beds were not available.  (Berryman's Notes, Dkt. 46, Ex. R).  The meeting concluded with Berryman telling Plaintiff that she would talk with Carolyn Anderson, NexCare's compliance director, about whether it was legal.  (Plaintiff's Notes, Pg. ID 670-71).

Shortly thereafter, Berryman spoke to Anderson over the phone, and Anderson told her that she could not tell patients that there were no long term beds available, saying "you're not allowed to say exactly that, we can't do that." (Berryman Dep., at 15:24-16:6).  Berryman subsequently spoke with Camps and Hart and told them they could not tell patients that there were no long-term beds available.  (*Id.* at 14:23-15:2).

When she spoke with Berryman, Anderson asked her whether anybody on her staff had actually told patients that they could not stay; Berryman said no. (Anderson Dep., at 37:8-12). Anderson notes that it would have been a "compliance concern" if someone had said this to a patient. (*Id.* at 37:23-38:1). According to Anderson, Berryman should have known that this practice was impermissible (*id.* at 72:9-11). Anderson indicated that all NexCare administrators, at NexCare's 16 other facilities, clearly knew that this practice was impermissible. (*Id.* at 46:14-18). Berryman's lack of knowledge, therefore, was a due to a gap in her training. (*Id.* at 72:4-8).

On August 31, 2012, Plaintiff had a meeting with Milgrom, Sturtevant, and Michelle Kaulbars, Integrity's HR person. (Plaintiff Dep., at 153:1-6). Also present was Mike Hicks, NexCare's HR director. (*Id.*) At the meeting, Plaintiff received NexCare's compliance program documents and was told to report any compliance concerns with NexCare's corporate compliance. (*Id.* at 154:6-12). NexCare had a compliance hotline; the hotline forwarded all concerns to Anderson. (Anderson Dep., at 42:19-22).

On September 3, 2012, Plaintiff began formulating her letter to corporate compliance. (Plaintiff's Notes, at Pg. ID 671). On September 4, 2012, she ran into Berryman in the hallway at South Lyon and Berryman allegedly told her "OK, then I will let people stay" before walking away quickly. (Plaintiff Dep., at 164:23-165:9). The next day, on September 5, 2012, Plaintiff visited Berryman at her office and

Berryman confirmed that she would let patients stay long-term if they needed to stay.  (Plaintiff's Notes, Pg. ID 671; Berryman Dep., at 55:14-56:4).

That same day, Plaintiff e-mailed Milgrom to tell her that since Berryman had assured her that the practice would cease, that she would no longer be filing a complaint with NexCare's corporate compliance.  (E-mails, Pg. ID 680).  Milgrom forwarded the e-mail to Sturtevant, Sturtevant's supervisor Cheryl Rankin, Berryman and Anderson adding, "Wrapped up.  I appreciate everyone's time and effort on this.  (*Id.*)

### G. That Fall, One of Plaintiff's Patients was Told that No Long-Term Beds were Available

In October or November 2012, Plaintiff saw one of her patients, DB, outside of South Lyon with her daughter.  (Plaintiff Dep., at 165:22-166:18).  DB's daughter was upset because Camps, the social worker, had told them that there were no long-term beds available.  (*Id.*)  Plaintiff urged the daughter to "push back" and to tell South Lyon that her mother really wanted to stay.  (*Id.* at 166:22-167:9).  The next day, the daughter approached Plaintiff and told her that Camps repeated that there were no long-term beds available.  (Plaintiff's Notes, at Pg. ID 671-72).  Plaintiff advised her to "push harder"; Plaintiff also spoke with Camps and told Camps that the mother really wanted to stay at the facility.  (*Id.* at Pg. ID 672).  Camps replied that Berryman had told the family that they could stay.  (*Id.*)  Since DB was allowed to stay, Plaintiff decided not to file a compliance complaint.  (*Id.*)

12

**H. Plaintiff's Incident with South Lyon Admissions Coordinator**

In December 2012, South Lyon admissions coordinator Shelby Green was filling out documents with one of Plaintiff's patients. (Staff Statement, Dkt. 46, Ex. Y, Pg. ID 721). She alleges that Plaintiff entered the room where Green was speaking to the patient and became "very irritated" that Green was interrupting Plaintiff's scheduled therapy session. (*Id.*) According to Green, the family stated "oh my God does she always talk to you like that? She was very rude, I hope she is not like that [with] us for therapy." (*Id.*)

Plaintiff recollection of this incident is that she needed to see the patient at the scheduled time because she could not reschedule the therapy session that day. (Plaintiff's Dep., at 188:7-189:16). She believed that she was kind during the interaction and did not know if the patient's family raised any concern about her attitude. (*Id.* at 180:20-21). In any event, Plaintiff did not receive a write-up for the incident and no one raised the issue with her at the time. (Plaintiff's Notes, at Pg. ID 674).

**I. In January 2013, Another Patient was Allegedly Told that no Long-Term Beds were Available**

On January 8, 2013, Plaintiff was in the therapy room with Whalen, Whalen's patient FD, and FD's daughter. (Plaintiff Dep., at 168:12-24). FD's daughter told Whalen that they had been told that no long-term beds were available at South Lyon. (*Id.*) Whalen recalls that the patient was crying because there were no long-term beds available. (Whalen Dep., at 15:4-11). A few days later, Whalen

advised the daughter to "push back a little more." (*Id.* at 15:21-16:3). The daughter then went to South Lyon's front office and said she told them that therapy had told her that her mother had a right to stay because long-term beds were available. (*Id.* at 16:7-11).

### J. Berryman Calls a Meeting with all Therapists Leading to Plaintiff's Suspension

The next morning, on January 9, 2013, Berryman entered the rehab gym and announced that all the therapists needed to meet with her immediately. (Plaintiff's Notes, at Pg. ID 672-73). Various therapists, including Plaintiff, were in the middle of therapy sessions with patients and had to cancel the sessions to attend the meeting. (*Id.*; Whalen Dep., at 16:12-22). Plaintiff's supervisor Sturtevant was out sick that day (Plaintiff Dep., at 174:15-16) and no Integrity management personnel was present at the meeting (*id.* at 202:11-15).[3]

At the meeting, Berryman concedes that she was "very angry, absolutely, absolutely." (Berryman Dep., at 18:24). She told the therapists that their job was to provide therapy, not to advise patients on how to remain at the facility longer. (*Id.* at 17:23-18:7). She emphasized that the therapists were not privy to all the factors included within a discharge determination. (*Id.*) Plaintiff responded that they should discuss the issue at hand, including Whalen's advice to FD to push back. (Plaintiff's Notes, at Pg. ID 672-73). Plaintiff also raised the issue of whether patients were being told that no long-term beds were available. (Berryman Dep., at

---

[3] Plaintiff, as a physical therapist, was an Integrity employee. Berryman was the director of the South Lyon facility; Sturtevant was the supervisor of the physical therapists.

19:7-8).  Berryman allegedly said angrily "we're not accepting long-term patients, and we're not breaking the law." (Whalen Dep., at 17:15-18).  She then allegedly pounded the table and said "I'm not mad at any of you.  I'm just mad at JoAnne.  So you guys can all go." (Plaintiff Dep., at 175:11-14).

As the other therapists exited the meeting, Whalen remained in the room with Berryman and Plaintiff, and admitted that it was her, and not Plaintiff, who had advised FD that she could stay. (Berryman Dep., at 24:8-25:14).  Berryman then told Plaintiff that she needed to "get on board with the direction we are going . . . we are doing nothing unethical or illegal and if she does not agree with the vision, she needs to find another facility to work in." (Berryman e-mail to Milgrom, Dkt. 46, Ex. X, Pg. ID 718-19).

After the meeting, Berryman called Milgrom, the Chief Operating Officer of Integrity, to discuss what had happened. (Berryman Dep., at 25:15-22).  Berryman felt that it was appropriate for her to call the meeting because it was her building, and she felt "completely entitled to correct any issues that I see fit in the building that I run, absolutely." (*Id.* at 26:14-16).  Berryman felt Plaintiff was insubordinate at the meeting. (*Id.* at 66:13-22).  She admits that she yelled at Plaintiff, stating "I yelled at her because she yelled at me . . . But I am the supervisor in the entire building, so me yelling, I think, is allowed." (*Id.* at 70:21-25).[4]

---

[4] This meeting brings into focus the unusual business operations and reporting relationships between the three companies, their managers, and their employees.  One supervisor characterizes as "insubordinate" an employee who technically works for another company and is therefore not actually her subordinate.  That same supervisor felt that she could "yell" at Plaintiff because she supervised the entire building.

In her e-mail to Milgrom, Berryman recounted how she called the meeting and explained that Plaintiff said that if it was not for her efforts, that South Lyon would have improperly discharged patients.  (Berryman e-mail to Milgrom, at Pg. ID 718-19).  Berryman elaborated that she told all therapists to stay within their realm of expertise and to raise any discharge issues with the social worker, not with patients.  (*Id.*)  That very evening, Integrity Area Manager Cheryl Rankin, Sturtevant's supervisor, called Plaintiff and told her that she was suspended indefinitely with pay.  (Plaintiff Dep., at 177:16-19).

The next morning, January 10, 2013, Milgrom [Integrity] responded to Berryman [South Lyon] and carbon copied Sturtevant [Integrity], Anderson [NexCare], and Oginsky [NexCare] on the e-mail.  She informed Berryman that Plaintiff had been suspended "starting today.  Once [Sturtevant] returns we will meet to take our next steps."  (Milgrom e-mail, at Pg. ID 718).

### K. Plaintiff is Terminated

After the January 9, 2013 meeting, Milgrom asked Sturtevant to have the therapists write letters regarding the meeting.  (Sturtevant Dep., at 12:20-13:5).  Sturtevant received multiple letters.  One was from Shelbie Green, the admissions coordinator; she recounted how Plaintiff had been rude at the December therapy session.  (Staff Statements, Dkt. 46, Ex. Y, Pg. ID 721).

Others remarked on how angry Berryman had been.  An anonymous letter stated that Plaintiff respectfully asked questions while Berryman was very angry.  (*Id.* at Pg. ID 722).  Therapist Christal Meyer remarked that she felt physically sick

16

after the meeting based on how Berryman had spoken to them and that she felt that "this was very [unprofessional] and I felt we needed someone here from Integrity to protect us." (*Id.* at Pg. ID 723-24).

On January 14, 2013, therapist Lori Heavener e-mailed Rankin telling her that she had spoken to Plaintiff. (Heavener e-mail, Dkt. 46, Ex. FF). Plaintiff allegedly told Heavener that South Lyon was unfair to the residents and that she would continue to inform patients of their rights. (*Id.*)

On January 17, 2013, Integrity's human resources manager, Kaulbars, called Plaintiff and asked her to come in for a meeting at Integrity's Brighton, Michigan office. (Plaintiff's Dep., at 181:12-20). Integrity Area Manager Cheryl Rankin, Sturtevant and Kaulbars were present at the meeting along with Plaintiff. (*Id.* at 182:20-183:6). Once the meeting began, Rankin read and handed Plaintiff a termination memorandum. (*Id.*) Plaintiff received it but refused to sign it. (Plaintiff's Notes, at Pg. ID 673).

The memorandum, purportedly written by Sturtevant,[5] stated that Plaintiff had been advising residents that they could remain in the facility despite the fact that, as a therapist, patient discharge was not within her area of expertise. (Termination Memorandum, Dkt. 46, Ex. Z). It highlighted the December 2012 meeting and stated that Plaintiff was unprofessional and rude to the admissions coordinator and that the family had raised concerns about Plaintiff's attitude. (*Id.*)

---

[5] Sturtevant maintains she did not write this memorandum but was told to sign it. (Sturtevant Dep., at 11:23-12:2)

17

Lastly, it stated:

> In January 2013 your Administrator reported that you once again involved yourself in a discussion of long term care and discharge options and regulations with a family and patient rather than referring them to the appropriate qualified professional in the center.
>
> Your continued pattern of behavior, specifically insubordination and unprofessional conduct as well as working outside of your area of knowledge and expertise has resulted in cause for your immediate termination.

(*Id.*)  According to Sturtevant, Plaintiff's direct supervisor, she played no role in the investigation of Plaintiff, or in the decision to terminate Plaintiff (other than collecting the staff letters).  (Sturtevant Dep., at 10:8-9.)  She did not have problems with Plaintiff and considered Plaintiff "a good staff therapist."  (*Id.* at 10:19-21.) She also had never disciplined Plaintiff or observed Plaintiff behave unprofessionally or insubordinately.  (*Id.* at 14:14-22).

Although the memorandum identifies Sturtevant as its author, Sturtevant testifies that she did not write it.  (*Id.* at 11:23-12:2.)  Indeed, Sturtevant was not even aware that Plaintiff would be fired at the meeting.  (*Id.* at 19:7-9.)  Although she signed the memorandum, she "didn't think" she had a choice whether to sign it or not (*id.*) and felt that if she tried to help Plaintiff that her own job would have been in jeopardy.  (*Id.* at 28:18-21).  She disagreed with the memorandum's statement that Plaintiff exhibited a pattern of insubordination or unprofessional conduct (21:15-18) and regrets signing it.  (*Id.* at 28:10-16).  She states that if she could have done it differently, she would not have signed it.  (*Id.*)

**L.  Plaintiff Brings this Complaint**

Believing that she was fired for raising compliance concerns, Plaintiff filed suit against NexCare on October 7, 2013.  (Dkt. 1).  NexCare filed a motion to dismiss, which the Court denied on October 4, 2014.  (Dkt. 19).  On April 21, 2015, Plaintiff filed her first amended complaint against NexCare and South Lyon.  (Dkt. 36).  Plaintiff raises two counts:  Count I for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) and Count II in the alternative for tortious interference.  (*See id.*)  On June 1, 2015, Defendants filed the instant motion for summary judgment (Dkt. 46).  Following full briefing, the Court held oral argument on December 15, 2015.

## II.  ANALYSIS

**A.  Standard of Review**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party.  *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

## B. Discussion

### 1. False Claims Act (FCA) Claim

Plaintiff claims that Defendants retaliated against her in violation of 31 U.S.C. § 3730(h)(1). Defendants respond that they are entitled to summary judgment because (1) they are not proper parties; and (2) Plaintiff has failed to show that there is a triable question of fact that they retaliated against her. The Court will address each contention in turn.

#### a. *Defendants are Proper Parties*

Defendants claim that Plaintiff is suing the wrong parties because she can only maintain her retaliation claim against her employer, the now-defunct Integrity Rehab Services. Plaintiff counters that Defendants are properly before the Court

20

under the plain meaning of § 3730(h)(1), the common law joint employer doctrine, and that NexCare is an alter ego of Integrity.  The Court concurs.

(i)  <u>Defendants are properly before the Court under § 3730(h)(1)</u>

The FCA's anti-retaliation provision, § 3730(h)(1), states that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

Originally, employees could only bring actions against their actual employer under §3730(h).  *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062 (6th Cir. 2014).  However, in 2009, Congress expanded the scope of § 3730(h) to cover "[a]ny *employee, contractor, or agent.*"  *Id.* (citing Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617) (emphasis in original); *see also Carnithan v. Cmty. Health Sys., Inc.*, No. 11-CV-312-NJR-DGW, 2015 WL 9258595, at *4 (S.D. Ill. Dec. 18, 2015) (collecting cases).

"The 2009 Amendments to section 3730(h) added 'contractors' and 'agents' to the description of persons within the scope of the Act's protections.  Although the amendments did not define those terms, it is clear that the purpose was to ensure that the protections of the Act extended beyond a traditional employment relationship.  The amendments sought to address court decisions that had concluded that persons who were not technically employees, such as independent

21

contractors or doctors without traditional employment relationships with hospitals." The False Claims Act:  Fraud Against the Government § 5:1.

As such, in addition to an employee's actual employer, "the current version of the statute also covers independent contractors and other *employment-like relationships*." *Tibor v. Mich. Orthopaedic Inst.*, 72 F. Supp. 3d 750, 759 (E.D. Mich. 2014) (emphasis added).  Indeed, § 3730(h)(1) plainly covers more than just employees, contractors, and agents as it prohibits retaliation for "lawful acts done by the employee, contractor, agent or *associated others*."

Turning to the case at bar, both Defendants are properly before the Court pursuant to § 3730(h)(1).  Integrity employees were contractors who provided rehab services to South Lyon.  (Contract, Dkt. 46, Ex. D).  Section 3730(h)(1) protects "[a]ny employee, contractor, or agent."  South Lyon, therefore, is liable for any improper retaliation against Plaintiff, a contractor, for protected conduct.

The same is true for NexCare because Integrity employees had an "employment-like relationship" with NexCare.  NexCare managed Integrity employees' 401(k) accounts and administered their health benefits.  (Plaintiff Dep., at 69:20-70:1; Milgrom Dep., at 36:9-14).  In addition, Plaintiff was subject to NexCare's rules and regulations, including its corporate compliance program. (Milgrom Dep., at 75:25-76:3).  Further, the record indicates that NexCare had extensive involvement in the actions that led to Plaintiff's dismissal.  NexCare was in charge of ensuring South Lyon's compliance with federal and state laws. (Anderson Dep., at 33:1-34:9).  On August 31, 2012, NexCare's HR director Mike

22

Hicks met with Plaintiff regarding her concerns that South Lyon was unlawfully informing patients that there were no long-term beds available. (Plaintiff's Dep., at 153:1-6). When Plaintiff decided not to file a compliance complaint in September 2012, Integrity's Milgrom e-mailed NexCare's compliance director Anderson, telling her "[w]rapped up. I appreciate everyone's time and effort on this." (E-mails, Pg. ID 680). And on January 10, 2010, Milgrom e-mailed Anderson and NexCare's executive Oginsky to inform them that she had suspended Plaintiff "starting today." (Milgrom e-mail, Pg. ID 718). These facts support a finding of an employment-like relationship between Plaintiff and NexCare.

> (ii) <u>Plaintiff's common law theories also support finding that Defendants are proper parties.</u>

In addition to § 3730(h)(1), Plaintiff claims that NexCare and South Lyon were here joint employers and that NexCare was an alter ego of Integrity.

"One entity is the joint employer of another entity's formal employees, and thus liable under federal and state anti-discrimination laws, if the two 'share or co-determine those matters governing essential terms and conditions of employment.'" *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 492 (6th Cir. 2011). "The major factors in this determination are the ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance."

The record supports at least a question of fact as to whether South Lyon and NexCare were joint employers with Integrity under these standards. Although Defendants deny that South Lyon had the power to fire Plaintiff, the record

provides ample support for the conclusion that South Lyon's manager was the moving force behind Plaintiff's termination. Berryman, the administrator for South Lyon, had the power to interrupt therapists' sessions with their patients and haul them into an emergency meeting. (Plaintiff's Notes, at Pg. ID 672-73). At this meeting, Berryman admittedly "yelled" at Plaintiff, appeared to threaten Plaintiff's employment, and told her to "get on board with the direction we are going . .. [or] find another facility to work in." (Berryman e-mail to Milgrom, at Pg. ID 718-19). And it was Berryman's post-meeting discussion with Milgrom that triggered Plaintiff's suspension and subsequent termination. And while Milgrom denies that Berryman had the power to fire Plaintiff, she admits that it was a factor in the termination decision. (Milgrom Dep., at 129:22-130:7). Further, Berryman unabashedly claims that she had power over Integrity employees, as she felt "completely entitled to correct any issues that I see fit in the building that I run, absolutely." (Berryman Dep., at 26:14-16).

Turning to NexCare, there is also a question of fact as to whether it acted as Plaintiff's joint employer with Integrity. First, Berryman's conduct is arguably attributable to NexCare as it hired Berryman and Berryman reported directly to NexCare's Oginsky. (Berryman Dep., at 26:23-27:22; Anderson Dep., at 32:4-21). Second, NexCare set rules of employment that Integrity employees had to abide by, such as its compliance program. In addition, as described above, NexCare was involved in addressing Plaintiff's compliance concerns and was informed of Plaintiff's suspension and termination. And NexCare's compliance responsibilities

24

likely extended to ensuring that South Lyon did not improperly retaliate against employees for raising legitimate compliance concerns.

Plaintiff also raises a question of fact as to whether NexCare and Integrity were alter egos. Alter ego liability is analyzed through the "well-established factors of substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership." *N.L.R.B. v. Allcoast Transfer, Inc.*, 780 F.2d 576, 581 (6th Cir. 1986). The record indicates that NexCare and Integrity shared common ownership (Anderson Dep., at 49:22-50:1) operated out of the same building, and shared the same P.O. Box. (Dkt. 46, p. 1; Milgrom Dep., at 83:5-7). While NexCare offered broader services than Integrity, who only offered rehab services, both companies served nursing homes. Therefore, although the record is not conclusive, Plaintiff has raised a question of fact as to whether NexCare and Integrity were alter egos.

For the reasons discussed above, Defendants are proper parties to this suit.

### b. *The Record Contains Sufficient Evidence to Raise a Genuine Issue that a Prima Facie Claim of Retaliatory Discharge Exists*

"Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims." *Jones-McNamara v. Holzer Health Sys.*, No. 15-3070, 2015 WL 6685302, at *3 (6th Cir. Nov. 2, 2015). "The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive." *Id.* "Direct evidence is evidence, which if believed, does not require an inference that unlawful retaliation motivated

an employer's action." *Id.* (internal quotation marks omitted). "Where a plaintiff produces direct evidence of retaliation, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Id.* (internal quotation marks omitted).

Where a plaintiff relies on circumstantial evidence of discrimination, as here, the *McDonnell Douglas* framework applies. *Id.* "Under the *McDonnell–Douglas* test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation." *Id.* "To establish a prima facie case, the plaintiff must show the following elements: (1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.*

"Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action . . .  At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.* (internal citation omitted).

Defendants challenge all three elements of Plaintiff's prima facie claim.  The Court will address each in turn.

(i) <u>Plaintiff engaged in protected conduct</u>

Defendants argue that Plaintiff did not engage in protected conduct for two reasons (1) because violations of patient transfer and discharge rules—42 U.S.C. § 1395i-3(c)(2); 42 U.S.C. § 1396r(c)(2); and 42 C.F.R. 483.12(a)—are violations of a condition of participation not payment, and (2) because Plaintiff did not have a good-faith basis for her concerns.

*(a) Protected conduct need not result in an actionable FCA violation*

Relying on *McKenzie v. BellSouth Telecommunications, Inc.,* 219 F.3d 508, 517 (6th Cir. 2000), Defendants re-hash the arguments that this Court explicitly rejected in its order denying NexCare's motion to dismiss. (Dkt. 19). This Court stated in part:

> It is immaterial whether the conduct alleged by Plaintiff—if true—would constitute a prima facie violation of the FCA on a claim for false certification. If Plaintiff's internal reporting of Defendant's practices is protected activity under the FCA, then Plaintiff has stated a legally sufficient retaliation claim. The Act protects an employee who is punished for his or her "efforts to stop" violations of the FCA; its protection is not limited to only those employees whose complaints turn out to prove a violation of the FCA by a preponderance of the evidence. Such an interpretation would afford little protection for (and have a significant chilling effect on) whistleblowers, who are not FCA experts and are only able to report what they suspect to be fraud or misconduct.

(Dkt. 19, pp. 7-8). Since then, the Sixth Circuit has clarified that the FCA's "statutory amendment removes *McKenzie*'s requirement that protected conduct could 'lead[ ] to a viable FCA action[.]'" *Jones-McNamara v. Holzer Health Sys.*, 2015 WL 6685302, at *5.

27

Here, the record amply demonstrates that Plaintiff sought to "stop 1 or more violations of this subchapter." When she raised the issue of whether South Lyon was improperly telling patients that long-term beds were not available, Plaintiff was attempting to stop South Lyon from improperly discharging patients once their payment source changed from Medicare Part A to less lucrative sources. Plaintiff was raising this practice to her supervisors in order to stop a violation of the FCA.

*(b) Plaintiff had a good-faith basis for her compliance reports*

The Sixth Circuit has recognized that protected activity also consists of a reasonable belief ("good faith") requirement. *Jones-McNamara*, 2015 WL 6685302, at *5 (citing *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) ("the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.")). Defendants claim that Plaintiff's belief that South Lyon's employees were telling patients that no long-term beds were available was based solely on gossip and speculation. This argument is not well-taken.

The record demonstrates that Plaintiff had a reasonable belief that South Lyon employees were telling patients that no long-term beds were available. Plaintiff first learned about the alleged practice from other therapists, who were "very upset" that patients were being improperly transferred. (Plaintiff's Dep., at 111:1-112:3). The record contains evidence that two of Whalen's patients were told

28

that no long-term beds were available.  (Whalen Dep., at 7:18-8:24; 16:7-11).  In the Fall of 2012, Plaintiff's patient DB told her that she had been told that no long-term beds were available.  (Plaintiff's Dep., at 165:22-166:18).

In addition, Berryman admits that she had a goal of aggressively increasing short-term patients, as this was "financially beneficial."  (Berryman Dep., at 45:16-46:7).  Although this goal was not necessarily improper, Berryman concedes that she did not know that it was illegal to tell patients that no long-term beds were available.  (Berryman Notes, Dkt. 46, Ex. R).  Milgrom, Integrity's COO, also did not know of the illegality of this practice.  (Milgrom Dep., at 105:8-11).

The record also indicates that Berryman should have known this, as Anderson reported that the illegality of this practice was clear to all of NexCare's other facility administrators.  (Anderson Dep., at 46:14-18; 72:9-11).  When Plaintiff first raised the issue with Berryman, she identified Camps and Hart as the South Lyon employees who were allegedly telling patients that long-term beds were unavailable.  (Berryman Dep., at 13:22-15:5).  Plaintiff's concern was serious enough that Berryman subsequently spoke to Camps and Hart and told them they could not say this to patients.  (*Id.* at 14:23-15:2).

Further, Plaintiff consulted on several occasions with an elder law attorney and an ombudsman in order to ascertain the legality of this practice.  And when the last incident allegedly occurred, on January 8, 2013, Plaintiff was personally present when FD's daughter told Whalen that her mother had been informed that no long-term beds were available.  (Plaintiff's Dep., at 168:12-24).  The facts on this

record could reasonably lead to the formation of a good-faith belief that Defendants were telling patients that no long-term beds were available.

Moreover, the authority cited by Defendants' is easily distinguishable.  In *Mikhaeil v. Walgreens Inc.*, No. 13-14107 2015 WL 778179at *1 (E.D. Mich. Feb. 24, 2015), the court held that the plaintiff was merely grumbling when she alleged that her co-worker violated "DEA laws" by filling a patient's prescriptions early.  In *Mahony v. Universal Pediatric Services, Inc.*, 753 F. Supp. 2d 839 (S.D. Iowa 2010), the plaintiff did not present any corroborating evidence on summary judgment and he only claimed that his employer was about to violate the law.  Lastly, *Weiss v. AER Services, Inc.*, No. 13-C-584, 2014 WL 3850059 at *1 (E.D. Wis. Aug. 5, 2014) involved a plaintiff who accused a meat packer of propping up a fake synagogue to obtain fraudulent visas without any corroborating evidence.  Unlike these cases, Plaintiff was not making unjustified accusations bereft of evidence.  Plaintiff became concerned about Defendants' actions in the context of her job as a therapist, where she heard from co-workers, patients, and their families that South Lyon was telling patients that long-term beds were not available.

Good faith consists of "honesty in belief or purpose."  Black Law's Dictionary (10th ed. 2014).  The evidence is sufficient to show that Plaintiff honestly and reasonably believed that patients were being told that long-term beds were not available.

(ii) <u>Defendants knew that Plaintiff had engaged in protected conduct</u>

The record is replete with examples of Plaintiff meeting with and e-mailing NexCare, Integrity, and South Lyon employees about her belief that patients were being told that long-term beds were not available. Defendants knew that she had engaged in protected activity.

(iii)   <u>Plaintiff has made a showing that Defendants discharged her as a result of her protected activity</u>

Defendants contend that courts now apply a "but for" causation standard that requires that a protected activity "be the sole reason for an adverse action."[6] (Dkt. 46, p. 21) (emphasis omitted). But the Sixth Circuit has not adopted this standard—it has stated that plaintiffs must show "there was a causal connection between the protected activity and the adverse action." *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007).

Other courts have also failed to adopt a "but for" causation requirement. *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 101 (D.D.C. 2014) (causation requires that "the retaliation was motivated, at least in part, by the employee's engaging in protected activity); *U.S. ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1341 (M.D. Ga. 2011) (causation requires that "there is an inference of causation between the protected activity and the adverse action").

---

[6] *United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973 (N.D. Ill. 2015).

And in any case, a "but for" standard only requires that a plaintiff's protected activity be the "but for" cause of an adverse action, not the sole cause. Defendant claims that Integrity had many reasons to fire Plaintiff, including her insubordination and allegedly rude encounter with an admissions coordinator in December 2012. However, Plaintiff was not fired until after the January 9, 2013 meeting with Berryman when she again raised the issue of whether patients were being told that long-term beds were not available. Under these circumstances, Plaintiff has a made a prima facie showing that but for her continued reporting of an alleged violation, she would not have been fired.

        (iv)    <u>Integrity's legitimate business reasons for terminating Plaintiff</u>

Defendants argue that they had legitimate business reasons for terminating Plaintiff because she (1) continued acting outside of the scope of her employment by advising patients that they could stay; (2) behaved in an unprofessional and rude manner to a South Lyon admissions coordinator; and (3) acted in an argumentative and insubordinate fashion during the January 9, 2013 meeting with Berryman.

The record contains considerable countervailing facts that undermine the legitimacy of these proffered business reasons for terminating Plaintiff. As far as "advising patients they could stay," Plaintiff did not advise FD, Whalen's patient, to push back on January 8, 2013, Whalen did. (Berryman Dep., at 24:8-25:14). Defendants have not identified a single patient who Plaintiff advised to remain at the facility around the time of her termination. And merely raising a concern about whether South Lyon was continuing a practice of telling patients that long-term

32

beds were not available cannot legitimately be considered unprofessional conduct. According to Anderson, "[i]f it's factual, it's not unreasonable" to complain about employees telling patients that long-term beds were not available. (Anderson Dep., at 55:1-12). Plaintiff had heard from FD's daughter that South Lyon did not have long-term beds available and raised it with Berryman at the meeting. She had a factual basis for asking this, and she raised it with Berryman, not with a patient.

As to Plaintiff's allegedly "rude" encounter with Green in December 2012, the legitimacy of this ground is also questionable because this matter was never raised contemporaneously; Plaintiff was not written up or disciplined for the incident. Further, the incident occurred in December 2012 and Plaintiff was not suspended until January 9, 2013, after the meeting with Berryman.

As to whether Plaintiff behaved in an argumentative fashion at the meeting, it should be noted that Defendants never asked Plaintiff for her account of what occurred. And the reports they received from other therapists did not indicate that Plaintiff was argumentative. On the contrary, one says that Plaintiff "began to respectfully ask questions" to Berryman. (Staff Statement, Pg. ID 772). Another took issue with Berryman's conduct and stated, "I truly feel this was very [unprofessional] and I felt we needed someone here from Integrity to protect us." (*Id.* at Pg. ID 723-24). Only Berryman's account stated that Plaintiff was rude or unprofessional.

The record does not support a finding of no genuine issue of fact regarding whether Defendants had a legitimate business reason to terminate Plaintiff.

33

    (v) <u>Even if Defendants had a legitimate reason, Plaintiff has shown at least a question of fact regarding pretext</u>

Even if the Court held that Defendants had made a sufficient showing of a legitimate business reason, Plaintiff has made a sufficient showing of pretext. Where a defendant can show a legitimate reason for taking an adverse action, the burden shifts to the plaintiff to show "by a preponderance of the evidence that the proffered explanation is a pretext for [retaliation]." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

"A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392-93 (6th Cir. 2008).

Plaintiff has raised a question of fact as to pretext. Defendants' stated reason for terminating Plaintiff is contained in the termination memorandum. The record raises questions as to the reliability of the memorandum. Although it was purportedly "FROM: Barb Sturtevant," Sturtevant, Plaintiff's supervisor, denies writing it. (Termination Memorandum; Sturtevant Dep., at 11:23:12:2). And Sturtevant states that she only signed the memorandum because she feared for her job if she did not sign it (*id.* at 28:18-21).

Plaintiff has also raised a question of fact as to the legitimacy of the grounds for her termination, i.e., that she was inappropriately advising patients of their rights and engaging in unprofessional behavior. There is no evidence in the record

34

that Plaintiff allegedly advised any patients that they could stay at the facility long term during the relevant time period of the termination decision, around January 16, 2013.[7]  In regards to Whalen's patient FD, the only evidence in the record is that Whalen spoke to FD, not Plaintiff.  (*See* Berryman Dep., at 24:8-25:14; Whalen Dep., at 15:21-16:3; Plaintiff's Dep., at 170:2-10).  Further, the nature of Plaintiff's interaction with Green, where Green claims that Plaintiff was rude, is contested. (Termination Memo; Plaintiff's Dep., at 180:20-21).

Finally, Plaintiff has raised a question of fact as to whether her conduct was in fact unprofessional.  According to Sturtevant, Plaintiff was a "good staff therapist."  (Sturtevant Dep., at 10:19-21).  During the years that she was Plaintiff's manager, Sturtevant never disciplined Plaintiff or observed Plaintiff behave unprofessionally or insubordinately.[8]  (*Id.* at 14:14-22).  Sturtevant did not even know that Plaintiff would be fired at this meeting.  (*Id.* at 19:7-9).  And she disagreed that Plaintiff exhibited a pattern of insubordination or unprofessionalism (*id.* at 21:15-18).

Plaintiff has raised a sufficient question at this stage that Defendants' proffered reason "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action."  For these reasons, Defendants' motion for summary judgment as to Count I is **DENIED**.

---

[7] Plaintiff did speak to a patient about her rights back in October-November 2012, but she was not disciplined for this conduct.

[8] Further, if Defendants' position that Berryman could not discipline Plaintiff is correct, it is difficult to find a factual basis for its claim of insubordination, as in that case, Plaintiff was not Berryman's subordinate.  Nor was she Green's subordinate.

## 2. Tortious Interference Claim

Plaintiff also brings, in the alternative, a claim for tortious interference with an economic expectancy. Plaintiff raises this claim in the event that Integrity, South Lyon, and NexCare are considered entirely separate companies who are not found to be acting as joint employers. "To prevail on a claim of tortious interference with economic expectancy under Michigan law, Plaintiffs must prove: (i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage." *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014).

Under the first factor, the inquiry is to determine with whom did Plaintiff have a valid business relationship. "A plaintiff can establish a claim for tortious interference with an at-will employment relationship." *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1275 (E.D. Mich. 2011). "Even though the employment relationship is at-will, the plaintiff has an interest in making sure the employer is allowed to exercise its own judgment without the illegal interference or compulsion of third parties." *Id.* "It is the interference of third parties, not the 'fairness' of the employment decision that is actionable." *Id.*

Plaintiff clearly had a valid economic expectancy in her employment relationship with Integrity. Plaintiff, however, cannot claim such a valid expectancy in her relationship with South Lyon. Plaintiff was a contractor at South

36

Lyon and Integrity had the power to move Plaintiff to a different facility. (Dkt. 46, p. 2). Further, if Plaintiff did have a valid economic expectancy in her relationship with South Lyon, she would be unable to maintain a claim for tortious interference against South Lyon because "[a]n essential element of a tortious interference claim is that the defendant is a third party to the contract or business relationship." *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 772 (E.D. Mich. 2010). "A cause of action for tortious interference may not lie against a person that is not a third party to the anticipated contractual relationship." *Id.* Plaintiff, therefore, cannot claim that she had a valid economic expectancy in her relationship with South Lyon while at the same time maintaining a tortious interference claim against South Lyon, as South Lyon would not be a third-party to the relationship in that scenario. Adopting Plaintiff's assumption for the purposes of this claim that the entities here are not acting jointly, the Court finds that Plaintiff only had a valid expectancy in her relationship with Integrity.

The second element of tortious interference that Plaintiff must show is "knowledge of the relationship or expectancy on the part of the defendant." On this record, the evidence is sufficient to raise a genuine issue as to whether both South Lyon and NexCare had knowledge of Plaintiff's economic expectancy with Integrity because there is no dispute that they knew that Plaintiff was a therapist working for Integrity.

The third element requires an "intentional interference causing or inducing a termination of the relationship or expectancy." Intentional interference is "more

than just purposeful or knowing behavior on the part of the defendant." *Saab Auto*, 770 F.3d at 441. "[A] plaintiff must also allege that the interference was either (1) a per se wrongful act or (2) a lawful act done with malice and unjustified in law for the purpose of invading the . . . business relationship of another." *Id.* "[A] per se wrongful act is an act that is inherently wrongful or one that is never justified under any circumstances." *Id.* at 441-442. As to this first element, Defendants' actions were not *malum in se*. Under appropriate circumstances, it would be proper to terminate an employee for acting outside of the scope of their employment, insubordination, and unprofessionalism.

Regarding the second element, "[t]o establish that a lawful act was done with malice and without justification, [a] plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Id.* at 442-43. Treating NexCare as a wholly independent entity, as this Count must, it does not appear that the actions of NexCare's direct employees, including Anderson, Hicks, or Oginsky, rise to the level of "affirmative acts" that would corroborate the improper motive and establish malicious intent.[9] The Court has noted before that NexCare's employees were involved and informed as to Integrity's and South Lyon's treatment of Plaintiff. However, the record appears to show that it was Berryman's affirmative acts that led to Plaintiff's termination.

As to South Lyon, however, Plaintiff has raised a question of fact as to whether Berryman acted with malice in regards to her termination. The record

_____

[9] This high standard for showing malice under tortious interference is a different standard than finding that NexCare was Plaintiff's joint employer.

38

shows that Berryman was "very, angry, absolutely, absolutely" at the January 9, 2013 meeting with the therapists. (Berryman Dep., at 18:24). She singled out Plaintiff saying, "I'm not mad at any of you. I'm just mad at JoAnne." (Plaintiff Dep., at 175:11-14). She appeared to threaten Plaintiff's job. (Berryman e-mail, Pg. ID 718-19). She then immediately called Milgrom, the COO of Integrity, telling her of Plaintiff's "unprofessionalism" at the meeting. (*Id.*). The same day, Integrity suspended Plaintiff indefinitely. (Plaintiff Dep., at 177:16-19). Plaintiff has clearly raised at least a question of fact as to whether Berryman acted "with malice and without justification."

Plaintiff has also proffered sufficient facts to show that she was actually damaged by her termination. Plaintiff has testified, among other things, that she had difficulty finding work, has lost wages, and had damage to her professional reputation. (Dkt. 48, p. 24).

For the reasons discussed above, Defendants' motion for summary judgment as to Count II is **GRANTED** as to NexCare and **DENIED** as to South Lyon.

### 3. Defendants' Request for an Order Limiting Damages

Alternatively, Defendants request an order limiting Plaintiff's lost wages for failure to take reasonable efforts to minimize her damages. "[T]he question whether an employee was reasonable in not seeking or accepting particular employment is one to be decided by the trier of fact." *Morris v. Clawson Tank Co.*, 459 Mich. 256, 266 (1998). The Court sees no grounds for taking this determination from the jury. Defendants' request is **DENIED**.

## III. CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is **DENIED** as to Count I.  As to Count II, Defendants' motion for summary judgment is **GRANTED** as to NexCare and **DENIED** as to South Lyon.  Finally, Defendants' request for an order mitigating damages is **DENIED**.

**SO ORDERED.**

Dated:  March 31, 2016                          s/Terrence G. Berg
                                                                    TERRENCE G. BERG
                                                                    UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 31, 2016, using the CM/ECF system, which will send notification to all parties.

s/A. Chubb
Case Manager

40